[Cite as *Calabrese v. Judy*, 2025-Ohio-5284.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| JOYCE CALABRESE, | CASE NO. 2025-L-018 |
| Plaintiff-Appellant, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| MICHAEL JUDY, et al., | |
| Defendants-Appellees. | Trial Court No. 2023 CV 000457 |

---

## OPINION AND JUDGMENT ENTRY

Decided: November 24, 2025
Judgment: Affirmed

---

*Larry W. Zukerman*, *S. Michael Lear*, and *Adam M. Brown,* Zukerman, Lear, Murray & Brown, Co., L.P.A., 3912 Prospect Avenue East, Cleveland, OH 44115 (For Plaintiff-Appellant).

*Gregory E. O'Brien* and *Clayton Papenfus,* Cavitch Familo & Durkin Co., L.P.A., 1300 East Ninth Street, 20th Floor, Cleveland, OH 44114 (For Defendant-Appellee, Michael Judy).

*Monica A. Sansalone*, *Maia E. Jerin*, and *Jeremy S. Ribando,* Gallagher Sharp, L.L.P., 1215 Superior Avenue, 7th Floor, Cleveland, OH 44114 (For Defendant-Appellee, Caterina Cocca-Fulton).

EUGENE A. LUCCI, J.

{¶1} Appellant, Joyce Calabrese ("wife"), appeals the entry granting summary judgment to Michael Judy and Caterina Cocca-Fulton[1] (collectively "appellees") on wife's claims of third-party legal malpractice. We affirm.

---

1. The use of a hyphen in "Cocca-Fulton" is inconsistent in the record. We utilize the spelling containing a hyphen, as is reflected on the complaint and case caption.

{¶2} In 2009, following execution of a prenuptial agreement, wife married Park Casteel ("husband"). At the time of their marriage, both husband and wife had children from prior relationships.

{¶3} In 2014, husband and wife executed estate plans, including trusts, pour-over wills, and durable powers of attorney. Husband's trust named him as the trustee and his daughters, Erin Rainsberger and Beth Cady, as successor trustees. Husband funded his trust with personal and real property, including property that had been identified in the prenuptial agreement as his separate property. The trust directed that, upon husband's death, the trust was to distribute his assets to wife "for life." In the event that wife predeceased husband or they were not married at the time of husband's death, then his assets were to be distributed to his daughters. Upon wife's death, the trust was to distribute husband's assets to his daughters. Husband also executed a durable power of attorney, naming his daughters as his agents.

{¶4} In 2021, Rainsberger retained Judy, an attorney licensed in the State of Ohio, to review documents pertaining to husband. Thereafter, Judy referred Cocca-Fulton, also an attorney licensed in the State of Ohio, to consult with husband. After meeting with husband, Cocca-Fulton prepared a trust amendment, removing wife as a beneficiary of the trust. On November 4, 2021, husband signed the trust amendment. Husband passed away on November 24, 2021.

{¶5} In January 2022, wife filed an action against husband's daughters. Judy represented the daughters in this action. Wife voluntarily dismissed the complaint in 2023.

{¶6} Following dismissal of the Geauga County complaint, wife refiled the multicount complaint against husband's daughters, with additional claims against

Case No. 2025-L-018

appellees, in the Lake County Court of Common Pleas ("the trial court"). Relevant here, Calabrese set forth claims of third-party legal malpractice against appellees.

{¶7} In 2024, appellees sought summary judgment on the third-party legal malpractice claims. Wife responded in opposition to the motions. Appellees moved to strike certain affidavits and attachments presented by wife in her opposition. In an order dated September 13, 2024, the trial court ruled on the motions to strike and granted summary judgment to appellees, dismissing the claims against them. Wife attempted to appeal the dismissal of her claims against appellees. This court dismissed wife's appeal for lack of a final, appealable order.

{¶8} Following dismissal of wife's remaining claims, she timely noticed an appeal of the summary judgment ruling in favor of appellees. Wife assigns the following three errors for this court's review, which we address together to facilitate our discussion:

> [1.] The trial court abused its discretion in striking Alvin Mathews's expert report based upon its opinion that Ma[th]ews's report is speculative, renders a conclusion that is within the province of the finder of fact, and is therefore inadmissible.

> [2.] The trial court erred when it declined to determine the authenticity and admissibility of Appellant's evidence attached to the Affidavits of Attorneys Adam Fried and Larry Zukerman, though nevertheless held that, even if authentic, said evidence does "not change the outcome of the Motions for Summary Judgment."

> [3.] The trial court erred in granting Appellees' Motions for Summary Judgment.

(Emphasis and citations omitted.)

{¶9} "We review decisions awarding summary judgment de novo, i.e., independently and without deference to the trial court's decision." *Hedrick v. Szep*, 2021-Ohio-1851, ¶ 13 (11th Dist.), citing *Grafton v. Ohio Edison Co.*, 1996-Ohio-336, ¶ 10.

> Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977); *Allen v. 5125 Peno, LLC*, 2017-Ohio-8941, ¶ 6 (11th Dist.), citing *Holliman v. Allstate Ins. Co.*, 1999-Ohio-116. "The initial burden is on the moving party to set forth specific facts demonstrating that no issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Allen* at ¶ 6, citing *Dresher v. Burt*, 1996-Ohio-107. "If the movant meets this burden, the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists for trial." *Allen* at ¶ 6, citing *Dresher* at ¶ 18.

{¶10} Pursuant to Civ.R. 56(E), "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Although we review a decision granting or denying summary judgment de novo, we review a ruling on a motion to strike an affidavit set forth in support or opposition to summary judgment for an abuse of discretion. *Estate of Truesdell v. Tracie Brown Ins. Agency, Inc.*, 2024-Ohio-5440, ¶ 38 (11th Dist.). "An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'"" *Id.*, quoting *State v.*

Case No. 2025-L-018

*Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8 Ed.Rev. 2004).

{¶11} In the present case, the trial court granted summary judgment in favor of appellees on wife's third-party legal malpractice claims. The Ohio Supreme Court has adopted and reaffirmed the rule that "'[a]n attorney is immune from liability to third persons arising from his performance as an attorney in good faith on behalf of, and with the knowledge of his client, unless such third person is in privity with the client or the attorney acts maliciously.'" *Simon v. Zipperstein*, 32 Ohio St.3d 74, 77 (1987), quoting *Scholler v. Scholler*, 10 Ohio St. 3d 98 (1984), paragraph one of the syllabus; *see also LeRoy v. Allen, Yurasek & Merklin*, 2007-Ohio-3608, ¶ 15. "The rationale for this posture is clear: the obligation of an attorney is to direct his attention to the needs of the client, not to the needs of a third party not in privity with the client." *Simon* at 76.

> "Some immunity from being sued by third persons must be afforded an attorney so that he may properly represent his client. To allow indiscriminate third-party actions against attorneys of necessity would create a conflict of interest at all times, so that the attorney might well be reluctant to offer proper representation to his client in fear of some third-party action against the attorney himself."

*Id.*, quoting *W.D.G., Inc. v. Mut. Mfg. & Supply Co.*, 1976 WL 190343, *3 (10th Dist. 1976).

{¶12} Here, wife sought recovery on the third-party legal malpractice claims pursuant to the "malice" exception to immunity. As noted by the Second District, "there is little Ohio case law identifying what set of facts is necessary to constitute malice as a substitute for an attorney-client relationship." *Omega Riggers & Erectors, Inc. v. Koverman,* 2016-Ohio-2961, ¶ 31 (2d Dist.). The definition of "malice" for purposes of recovering punitive damages has been incorporated by courts in the context of third-party

legal malpractice actions. *See id.* In this context, "malice" refers to "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Id.*, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987).

{¶13} However, when applying the definition of "malice" in third-party legal malpractice actions, the Second District concluded that "resolving whether an attorney's actions could be construed as 'a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm' requires a subtle, but indispensable, distinction regarding applicable facts." *Omega Riggers & Erectors, Inc.* at ¶ 32. "An attorney should not suffer potential liability to third parties for advising and pursuing a client's non-criminal goals, even if those goals will subject the client to potential civil liability." *Id.* The Second District determined that "there needs to be something extraordinary, perhaps unethical conduct or conduct on the verge of fraud, before an attorney's conduct in furtherance of his client's goals could support a reasonable inference of malice." *Id.* at ¶ 34. Thus, the Second District held:

> [M]alice, as a substitute for an attorney-client relationship, cannot be predicated on actions by the attorney that the attorney is permitted to take, or even negligently may take, as part of the representation of plaintiffs' adversarial client. To constitute malice, the actions of the attorney must include a disregard of rights that the attorney, not the client, is required to protect and must include harm beyond that which legal action necessarily may inflict. In most circumstances, an attorney is not obligated to protect the rights of an adversary. Undoubtedly, every lawyer who throws a family out into the cold in the dead of winter by pursuing a forcible-entry-and-detainer action has a great probability of causing harm. That scenario does not result in malpractice liability. Therefore, in our view, to constitute malice as a conscious disregard for the

rights of others causing substantial harm that will suffice to substitute for an attorney-client relationship, facts must exist that demonstrate extra-legal activity.

*Id.* at ¶ 35.

{¶14} Here, on the issue of malice, the parties relied on deposition testimony and affidavits of several individuals, including those addressed below.

{¶15} First, with respect to Judy's deposition, he maintained that Rainsberger contacted him in September or October 2021, after being referred to him by a mutual acquaintance, a social worker who had been working with the family of husband and wife to coordinate care for husband. Judy maintained that he had never met or spoken with Rainsberger, husband, or wife prior thereto, and he never spoke with husband or wife thereafter. Rainsberger retained Judy to review and interpret documents relative to husband. Judy recalled that Rainsberger emailed him the prenuptial agreement along with the 2014 trust, durable power of attorney, pour-over will, and quit-claim deed. Rainsberger also sent Judy an April 15, 2021 letter from husband's physician referencing husband's name and date of birth, April 30, 1944. The physician's letter provided:

> To Whom It May Concern,
>
> I am the primary care physician for Park Casteel. Mr. Casteel's health is declining and is (sic) unable to make financial decisions.
>
> If you have any questions or concerns, please contact my office at the number below.

{¶16} Rainsberger informed Judy that she had used her durable power of attorney to change a beneficiary designation on one of husband's accounts from wife to herself. Judy indicated that this change would reflect poorly on her, and Rainsberger stated that she would be cashing in the IRA to assist in husband's healthcare expenses.

{¶17}   After reviewing the documents, Judy opined that some of the documents contradicted others, as the prenuptial agreement provided that the condominium and Morgan Stanley accounts were not to become property of wife, but the trust allocated these assets to wife for life. Judy called the attorney that prepared the 2014 documents, who informed Judy that he believed the prenuptial agreement and trust could exist together. Rainsberger had informed Judy that the attorney who prepared the trust was a friend of wife's family, which Rainsberger stated had raised her suspicions.

{¶18}   Judy informed Rainsberger that the 2014 trust was inconsistent with the prenuptial agreement, and Rainsberger was surprised. Thereafter, Rainsberger informed Judy that she told husband what Judy's conclusions as to the documents were, and he responded negatively. Rainsberger asked if anything could be done about the trust, and Judy informed her that he could not do anything about the trust because he could not represent husband, and husband was the only one who could modify the trust's terms. Judy advised Rainsberger that the most he could do was help her "get to the point where [husband] has that conversation with someone but that's as far as [Judy could] go." Judy had no information regarding husband's wishes aside from what was relayed to him by Rainsberger.

{¶19}   Thereafter, Judy called Cocca-Fulton to see if she might be interested in representing husband. Judy reached out to Cocca-Fulton because he did not know many attorneys in the area who performed trust work, and, although he did not know Cocca-Fulton well, she had a good reputation. After Cocca-Fulton indicated that she would have to review the matter, on October 27, 2021, Judy sent her an email. Judy was unaware of, and thus did not relay to Cocca-Fulton, any of husband's medical conditions. Judy

maintained that he deliberately did not seek information regarding husband, as he believed that another attorney should make determinations independently regarding husband's competency.

{¶20} The October 27, 2021 email set forth husband's name and contact information and stated that he was residing at Chardon Heathcare. Judy noted that his client, Rainsberger, one of husband's daughters, was the contact for husband. Judy also noted that "Rainsberger will give you privacy to meet with [husband], but unless you speak with her first and allow her to let [husband] know that you will be calling/visiting, he will likely not know who you are or want to speak with you. For reasons which are alluded to below, you will want to meet with [husband] when Joyce Calabrese, his current (2nd) wife is NOT present." Judy attached the following documents to the email: the 2009 prenuptial agreement, the 2014 trust, the 2014 pour-over will, the quit-claim deed vesting title to the condominium in the name of the trust, the durable power of attorney, and the April 2021 physician letter. After referencing these attachments, the remainder of the email stated:

> The crux of the problem is that there is a prenuptial agreement from 2009 which refers to several assets of [husband] which are meant to NOT become the property of his wife . . . :
>
> 1. Condominium at 592 Mock Orange Circle;
>
> 2. All investment and bank accounts, including those with Morgan Stanley.
>
> Nonetheless, 5 years later, in 2014, Mr. Casteel created a trust which currently owns the following assets:
>
> 1. Condominium at 592 Mock Orange Circle;
>
> 2. Morgan Stanley investment account ending in _____ (unknown as of the writing of this email, but with a balance of approximately $153,000) held in the name of the trust, the

amount of which remaining at [husband]'s death will be distributed in accord with the terms of the trust; and

3. 3 separate Huntington Bank accounts held in the name of the trust (Savings ending in [redacted], Savings ending in [redacted], and Checking ending in [redacted]), the amounts of which remaining at [husband]'s death will be distributed in accord with the terms of the trust.

Thus, the focus of the work before you is to amend Item VI of the trust so that the trust beneficiaries upon [husband]'s death are [his daughters], not [wife] (see Item VI. B., on the bottom of Page 3 of 15 of the Trust.). The idea is to support [husband] first and foremost. To the extent possible, during [husband]'s lifetime, the trust would also support [wife] with respect to necessities and allow her to live in the condominium for her lifetime. This right to reside in the condo would cease upon [husband]'s death and, in accord with the spirit of the prenuptial agreement, [wife] would never a beneficiary (sic) become the owner of the condominium or any of the financial accounts, particularly the PNC accounts and the above-referenced Morgan Stanley account.

For what it is worth, [husband] also has other assets in his name as an individual, including the following:

1. Morgan Stanley IRA, with his daughters Erin and Beth the long-ago designated pay-on-death beneficiaries;

2. Transamerica annuity "held" by Morgan Stanley naming [wife] as the current pay-on-death beneficiary (note that, as POA, Ms. Rainsberger recently executed a document purporting to remove Joyce as the beneficiary and inserting Ms. Rainsberger and her sister, Beth as beneficiaries. I told her that this would not look good and her recent beneficiary change should be halted or reversed. Ms. Rainsberger [and] I agreed and she will simply cash out this policy worth approximately $12,000. Other than cashing it out, the only clean way to do this is to have [husband] himself make the beneficiary change or somehow get it into the trust and subject to your anticipated amendment).

I urge you to have a conversation with Ms. Rainsberger and I also urge you to contact me should you have any questions. My understanding is that you will be able to meet with [husband] at Chardon Healthcare either tomorrow or Friday.

[Husband] is meant to leave Ohio (indefinitely? permanently?) to go to Pittsburgh (near Ms. Rainsberger's home) on Friday, November 5th.

I look forward to learning of your progress.

{¶21} In his deposition, Judy explained that this email set forth what needed to be accomplished from the perspective of his client, Rainsberger, for whom he was advocating. He had every expectation that Cocca-Fulton would make her own determination as to whether husband wanted the changes to his trust, and Cocca-Fulton never agreed to do as Rainsberger or Judy asked. Prior to husband's death, Cocca-Fulton did not disclose the specifics of the work she did for husband to Judy.

{¶22} Judy acknowledged that the October 27, 2021 email was not originally disclosed to wife's counsel in response to discovery requests in the initial lawsuit, in which he had represented Rainsberger and her sister. However, once Judy realized the omission, he called Cocca-Fulton's attorney and informed her that he did not see the email in the documents she produced and that his client did not produce it either. Cocca-Fulton's attorney called Judy back later and informed him that Cocca-Fulton did not have the email. Judy and Cocca-Fulton's attorney then attempted to contact wife's counsel on a three-way call but were unsuccessful and left a message. Judy also emailed wife's counsel, attaching a copy of the October 27, 2021 email. Later, Judy learned that wife's counsel wanted to cancel Cocca-Fulton's deposition in the initial lawsuit, which was scheduled for the next day. Judy maintained he never conspired with Cocca-Fulton to withhold the email.

{¶23} Cocca-Fulton was deposed after the refiling of this action. During her deposition, she stated that she has been an attorney licensed in Ohio since 2004 and has

maintained her own practice since 2009, focusing on estate planning. In 2021, Judy called her asking if she had an interest in accepting husband as a new client, and Judy provided Cocca-Fulton with some information as to the documents that were in place. It was clear to Cocca-Fulton from her discussion with Judy that she needed to review the documents and talk to husband to determine what husband's wishes were with regard to his estate. She contacted Rainsberger to make sure she could get access to husband in the Chardon Healthcare facility due to COVID restrictions. Cocca-Fulton clearly expressed to Rainsberger that she needed to meet with husband privately at the facility, as she does with all clients, which was not a problem. She specifically informed Rainsberger that she was not her attorney. Cocca-Fulton maintained that she has never personally met Rainsberger.

{¶24} Judy emailed Cocca-Fulton the trust, prenuptial agreement, will, quit-claim deed, physician's letter, durable power of attorney, and durable power of attorney for healthcare. She reviewed these documents briefly before meeting privately with husband on October 29, 2021. Cocca-Fulton did not bring anything aside from those documents to the meeting, and Cocca-Fulton indicated that she does not regularly record meetings with clients.

{¶25} At her deposition, Cocca-Fulton explained that she assesses testamentary capacity in every case. In determining husband's capacity at that meeting, Cocca-Fulton reviewed a list of assets with husband from the prenuptial agreement. Husband was aware of the assets listed on the prenuptial agreement and where they were located in his home. Husband had a smartphone, on which he pulled up pictures of certain items. Husband articulated the names of his children and his wife to her. "He was very clear

Case No. 2025-L-018

about who they were and what they, (sic) his relationship with them." Husband also showed Cocca-Fulton several pictures of his daughters that were on his phone.

{¶26} Cocca-Fulton explained to husband that the prenuptial agreement and the 2014 trust were not consistent. The prenuptial agreement identified the separate assets of husband and wife and indicated that these assets would pass to their respective children. The 2014 trust, however, provided assets listed in the prenuptial agreement would go to wife, apparently for her life. However, husband informed Cocca-Fulton that he intended that the assets benefit wife during his life, not hers. After reviewing the documents with husband, it was clear that husband wanted to amend the trust, as he wanted all of his assets to go to his daughters. Husband instructed Cocca-Fulton to prepare the paperwork.

{¶27} During her deposition, Cocca-Fulton identified a memorandum that she had prepared after the meeting with husband once she returned to her office. Cocca-Fulton stated that the memorandum contained a typographical error in the date, as it was dated October 29, 2022, but it should have been dated October 29, 2021.

{¶28} In the memo, Cocca-Fulton indicated that husband "specifically said he wants the paperwork so that his house and all his things go to his children. We reviewed existing documents. He understands: He wants his assets, belongings, furnishings, house, all to go to his biological children." She further indicated that husband was amenable to wife residing in the condominium during husband's life if she wanted to live there, but, upon his death, it was to pass to his children.

{¶29} The memo also contains a legal capacity checklist with four bullet points. The first point pertained to whether husband knew the natural objects of his bounty.

Case No. 2025-L-018

Cocca-Fulton determined that husband was aware of his daughters, and he was able to name wife "and that she has a son and daughter." Cocca-Fulton explained in her deposition that she did not specifically ask husband about wife's children, but husband referenced a son and daughter of wife during their conversation. Husband's adult stepchildren were not a particular concern to Cocca-Fulton in determining if husband was aware of the natural objects of his bounty; however, she did believe it to be relevant because husband had mentioned specific items that he had given to wife's son and daughter. For example, husband indicated that he had arranged to "give" and "sell" wife's son a car, and he showed Cocca-Fulton a picture of it. Husband did not mention wife's son by name, and she did not ask his name. She did not ask husband how many children wife had. Cocca-Fulton did not request that he expand upon the nature of the transaction that involved both a gift and a sale.

{¶30} The second bullet point on the memorandum pertained to whether husband comprehended the kind and character of his property. Cocca-Fulton reviewed each asset listed in the prenuptial agreement with husband, and husband was able to talk with her about those assets. Husband indicated that he had given an armoire listed in the prenuptial agreement to wife, but he confirmed his ownership of other assets contained in the prenuptial agreement, including certain oil paintings that he stated were located in his home. Husband believed that his home was worth a "couple hundred thousand" dollars. Husband also indicated that all of his accounts were in his trust, and Cocca-Fulton did not inquire as to the amount of the accounts.

{¶31} The third bullet point addressed whether husband understood the nature and effect of his act. Husband believed that the entirety of his property would pass to his

daughters upon his death. Cocca-Fulton explained to him that the trust was not clear on that point and was inconsistent with what he was telling her. Instead, the trust appeared to give wife an interest in his property for her life. Because of how the trust is written, all of the trust property could be squandered during wife's lifetime. Husband indicated to Cocca-Fulton that was not what he intended, and he wanted a trust amendment to clarify his intention to distribute all of his property to his children upon his death.

{¶32} The final bullet point on the memo pertained to whether husband was able to make a disposition for his property according to a plan formed in his mind, and, as previously stated, husband had a specific plan that his assets were to go to his children upon his death.

{¶33} Cocca-Fulton had no concerns with husband's ability to understand his actions, and she had no belief that husband was being pressured into amending the trust. Cocca-Fulton recalled that when a nurse entered the room without waiting for permission to come in, husband was unhappy that she barged in and told her, "Get out. Can't you see I'm meeting with my attorney and we're going over papers?"

{¶34} With respect to this point, the memo references that husband "wanted the door closed – had to explain the witness was necessary – a nurse came in – he had words with her that this was a private meeting 'with my attorney.' We reviewed documents to sign." This portion of the memo appears to indicate that a witness was present at the October 29, 2021 meeting and that they reviewed the trust amendment for husband to sign on that date.

{¶35} However, Cocca-Fulton maintained during her deposition that, after her first meeting with husband, she prepared the trust amendment and scheduled a second

meeting with husband to sign it on November 4, 2021, with a witness present at that time. At the second meeting, she reviewed the entire document with husband, and when he was ready to sign, she called her spouse in as a witness. Cocca-Fulton did not have any question about his capacity to sign the document at that time. Among the assets listed in the trust amendment were the oil paintings and certain accounts held at Huntington. Husband also signed Cocca-Fulton's fee agreement as her client. Rainsberger signed the fee agreement electronically for approval of Cocca-Fulton's hourly rate as husband's agent under the power of attorney and based upon the physician's letter that stated that husband was unable to make financial decisions. However, Cocca-Fulton clarified that the determination that husband was unable to make financial decisions was a separate issue from whether he possessed legal testamentary capacity.

{¶36} With respect to husband's health, Cocca-Fulton was not aware why husband was at the Chardon Healthcare facility, and she did not ask. She stated that she was unaware of whether the facility had a memory care unit, or whether husband was within such a unit. She was unaware as to whether husband had been diagnosed with dementia or Alzheimer's Disease. Although Cocca-Fulton had reviewed the physician's letter, she did not inquire of husband why his doctor concluded that he was unable to make financial decisions. She was aware that Rainsberger was husband's agent under a durable power of attorney for healthcare, but she did not request that Rainsberger permit her to speak with husband's physician. Furthermore, she did not believe that Rainsberger automatically became successor trustee based on the physician's letter and the disability provision in the 2014 trust because the language used in the physician's letter and the 2014 trust were not identical.

Case No. 2025-L-018

{¶37} With respect to her relationship with Judy, Cocca-Fulton stated that they are professional acquaintances. She confirmed that husband was the only referral she had received from Judy. As far as her referrals to Judy, Cocca-Fulton recalled that approximately 10 to 15 years prior, she had referred one individual to Judy for criminal work.

{¶38} Further, Cocca-Fulton did not seek any guidance or advice from Judy or any other person in drafting the trust amendment. Neither was she influenced by Rainsberger in preparing the trust amendment. Cocca-Fulton received $952 that she invoiced for her services for husband, and no one offered or promised her any compensation aside from her earned fee. Cocca-Fulton stated that her only communications with Rainsberger prior to husband's death pertained to scheduling the initial appointment and confirming the second appointment. Rainsberger reached out to Cocca-Fulton a couple of times other than that, but Cocca-Fulton did not engage with her aside from logistics prior to husband's death.

{¶39} With respect to Judy's October 17, 2021 email addressed in our discussion of his deposition above, Cocca-Fulton acknowledged that she received a letter from one of wife's attorneys dated December 10, 2021, demanding preservation of evidence related to husband. She maintained that she complied with this letter. She later received a subpoena duces tecum for her file in this matter in the originally filed action in Geauga County. She responded to the subpoena by raising concerns regarding privilege. After waivers were signed by the parties, Cocca-Fulton produced all the documents that she had in her possession regarding husband, including electronically stored information. In responding to the subpoena, Cocca-Fulton searched her email for correspondence

related to husband. She did not come across the October 2021 email from Judy, and thus she did not produce it in response to the subpoena. Cocca-Fulton was not sure if she had deleted the email at some point, but, after learning of the omission, she looked again, and she was unable to find the email. She did not recall the body of the email specifically, but she did recall receiving the email attachments from Judy.

{¶40} In Rainsberger's deposition, she stated that, after husband had met with Cocca-Fulton, he informed Rainsberger that they had a "great conversation," and he was happy that the trust amendment aligned with his wishes as expressed in the prenuptial agreement.

{¶41} In wife's deposition, she maintained that she visited husband nearly every day at the Chardon Healthcare facility until Rainsberger arranged for him to be transferred to a facility in Pittsburgh against wife's wishes. Husband was not capable of holding a conversation at that point in his life, but he would have moments of clarity. Wife indicated that husband had mentioned something about signing papers when he was at Chardon Healthcare, but she was unaware that a trust amendment had been prepared and executed until after his death. Wife affirmed that she had never met or had any interaction with Cocca-Fulton. Wife stated that she had no reason to believe that Cocca-Fulton held any ill-will or hatred toward her aside from what Rainsberger may have told her. Wife was unaware of any steps Cocca-Fulton took to determine husband's capacity. Three or four weeks after husband's death, wife's daughter informed wife that Rainsberger had the trust changed to remove wife as a beneficiary. Wife was not aware how her daughter learned of this change.

{¶42} Wife further acknowledged that she had never met or spoken with Judy. She did not know what steps Judy took to collude against her. When asked what facts supported that Judy harbored any ill-will or hatred toward her, wife responded that she believed that Judy was involved with Cocca-Fulton in effectuating the trust amendment just prior to Rainsberger moving husband to a facility in Pittsburgh, where wife did not want him to go.

{¶43} In their motions for summary judgment, Judy and Cocca-Fulton primarily relied on the deposition testimony and exhibits as addressed above for the following facts. Appellees had no involvement with husband or his family prior to Rainsberger's referral to Judy. Judy reviewed materials submitted to him by Rainsberger, and, representing Rainsberger, indicated that he could not also represent husband with respect to the trust. He then contacted Cocca-Fulton, with whom he was a professional acquaintance, to inquire as to whether she would be interested in representing husband. After reviewing the documents received from Judy, Cocca-Fulton determined that she would need to speak to husband to ascertain his wishes. Cocca-Fulton arranged to meet with husband by contacting Rainsberger. Cocca-Fulton specifically advised Rainsberger that she was not Rainsberger's attorney, and she spoke with Rainsberger only to arrange or confirm appointments with husband and for her authorization of Cocca-Fulton's fee as husband's agent under a power of attorney. Cocca-Fulton independently assessed husband's testamentary capacity, concluding that he had the requisite capacity to amend his trust. Cocca-Fulton proceeded to effectuate husband's clear wishes that he expressed to her regarding the disposition of his assets.

{¶44} Based on the foregoing, we conclude that appellees met their initial summary judgment burdens of setting forth specific facts demonstrating that no issue of material fact existed; specifically, they did not represent wife in this matter and they did not act with malice that would support a third-party malpractice claim. *See Allen*, 2017-Ohio-8941, at ¶ 6 (11th Dist.), citing *Dresher*, 1996-Ohio-107.

{¶45} Accordingly, the burden shifted to wife to demonstrate that a genuine issue of material fact existed for trial. *Allen* at ¶ 6, citing *Dresher* at ¶ 18; *Omega Riggers & Erectors, Inc.*, 2016-Ohio-2961, at ¶ 35 (2d Dist.) ("Malice, as a substitute for an attorney-client relationship, cannot be predicated on actions by the attorney that the attorney is permitted to take, or even negligently may take, as part of the representation of plaintiffs' adversarial client.").[2]

{¶46} In opposing summary judgment, wife attached several affidavits including an affidavit and report of Alvin Mathews. In his report, Mathews first recited his qualifications as an expert in legal ethics. Mathews' summary opinion concluded:

> It is my opinion to a reasonable degree of legal and/or professional probability and certainty that, by facilitating the preparation of and preparing an Amended Trust Agreement for [husband] during and/or at a period in time in which [husband]'s testamentary capacity was questionable, at best, Mr. Judy and Ms. Cocca-Fulton committed third-party legal malpractice and otherwise breached their professional obligations by acting with malice, conspiring with Ms. Rainsberger and/or Ms. Cady to exert undue influence over [husband], and conspiring with and permitting Ms. Rainsberger and/or Ms. Cady to use their legal services to commit fraud and illegality, and to tortiously interfere with

---

2. In *Omega Riggers & Erectors, Inc.*, 2016-Ohio-2961, at ¶ 29 (2d Dist.), the Second District determined that an attorney moving for summary judgment in a legal malpractice case need only demonstrate the lack of an attorney-client relationship to shift the summary judgment burden to the non-movant to establish a genuine issue of fact remains as to exceptions to the attorney-client relationship, and the Second District rejected the proposition that an attorney must also demonstrate the absence of a triable issue on the exceptions to the attorney-client relationship. We need not address this issue in this case, as appellees met their summary judgment burden under either standard.

Case No. 2025-L-018

[wife]'s expectancy of inheritance, thereby proximately causing [wife] to suffer damages.

In reaching this conclusion, Mathews indicated that he learned several facts from the record and discovery which informed his opinion, many of which are contained in our discussion of the depositions above; although some of the "facts" appear to be characterized by opinions that Mathews drew from the facts.

{¶47} After reviewing what he asserted to be the relevant legal principles, Mathews maintained that "the bases for [his] opinions establishing Mr. Judy's and Ms. Cocca-Fulton's liability," included:

> Mr. Judy's admitted advocacy for his client, Ms. Rainsberger, was clearly designed to disinherit [wife] by facilitating the creation of an amendment to The Park D. Casteel Trust dated September 30, 2014 in such a way as to disinherit [wife] and make Ms. Rainsberger and Ms. Cady the sole beneficiaries of [husband]'s assets upon his death.
>
> The mechanism by which this was accomplished was to falsely portray the 2009 Prenuptial Agreement as being in conflict with and/or inconsistent with The Park D. Casteel Trust dated September 30, 2014 and, accordingly, that The Park D. Casteel Trust was invalid and/or that [husband]'s signing of the Trust was a mistake. With the knowledge of [husband]'s mental and/or cognitive decline - as documented in [the physician's] April 15, 2021 letter - Mr. Judy enlisted the services of Ms. Cocca-Fulton to further this false narrative that [husband] had made a mistake in executing The Park D. Casteel Trust dated September 30, 2014 and that his estate planning documents needed to be fixed by way of executing an Amended Trust.
>
> Mr. Judy and Ms. Cocca-Fulton's scheme to disinherit [wife] was committed with fraud, bad-faith, collusion, and malice in order to disinherit wife, breaching the standard of care applicable to attorneys, and showed a "conscious disregard" for [wife]'s rights, and proximately causing her injury.
>
> Mr. Judy and Ms. Cocca-Fulton acted in concert with one another and with Ms. Rainsberger, fraudulently colluded and

Case No. 2025-L-018

conspired for monetary gain, to disinherit [wife] by drafting the Amended Trust Agreement and obtaining the purported signature of [husband] thereon, at a time when [husband] was a susceptible party, was a resident at the Chardon Healthcare Center (where he was noted to have suffered from Alzheimer's Disease and Non-Alzheimer's Dementia), had previously been determined to be unable to make financial decisions on his own by his Primary Care Physician, and was just weeks away from his death.

Mr. Judy's October 27, 2021 email to Ms. Cocca-Fulton (copying Ms. Rainsberger) evidences fraud, bad-faith, collusion, and/or malicious conduct by Mr. Judy and Ms. Cocca-Fulton. Mr. Judy, on behalf of Ms. Rainsberger, who was serving as the agent under a power of attorney for [husband], instructed Ms. Cocca-Fulton, step by step, exactly how to secretly arrange to meet with [husband] at Chardon Healthcare, how to do so while isolating him from his wife . . . and what exactly would be stated in the terms of the Amended Trust Agreement which was designed to disinherit [wife].

At the direction of Mr. Judy and/or Ms. Rainsberger, Ms. Cocca-Fulton breached her ethical duty of providing competent representation to Mr. Casteel by failing to exercise knowledge, skill, thoroughness and preparation (reasonably necessary) to ascertain his testamentary capacity before preparing estate planning documents disposing his property inconsistent with the prior testamentary intent, reflected in the Trust Agreement entered in 2014. See Prof.Cond.R. 1.1.

At the direction of Mr. Judy and/or Ms. Rainsberger, Ms. Cocca-Fulton breached her professional obligations to [husband] to avoid conflicts of interest, placing the interests of Mr. Judy and/or Ms. Rainsberger over the interest of her purported client, [husband], and disregarding [husband]'s testamentary intent regarding the property of his estate. Despite knowing and/or possessing documentation and/or information that [husband] suffered from diminished capacity, Ms. Cocca-Fulton failed to take reasonably necessary protective action on his behalf, including consulting with individuals or entities that have the ability to take action to protect [husband] to ensure it was his desire to amend the Trust Agreement. See Prof.Cond.R. 1.7, and 1.14.

Although Rule 8.4(a) prohibits a lawyer from violating or attempting to violate the Ohio Rules of Professional Conduct,

through the acts of another, Mr. Judy recruited Ms. Cocca-Fulton as a "straw person" attorney to carry out the bidding of his client, Erin Rainsberger and/or Beth Cady for the sole purpose of disinheriting Ms. Calabrese, to the benefit of Erin Rainsberger and/or Beth Cady and/or himself, as counsel for Ms. Rainsberger. Serving as Mr. Judy's proxy, Ms. Cocca-Fulton, created an amended trust on the instructions of others who would benefit from the change.

Contrary to Rule 1.2(d) and Rule 8.4(c), the scheme by Mr. Judy, Ms. Rainsberger, and Ms. Cocca-Fulton was specifically engineered to conceal their clandestine efforts to disinherit [wife], in a manner to prevent [wife] from learning the same until the October 27, 2021 email ultimately came to light.

By attempting to shield the October 27, 2021 email from discovery, Mr. Judy and Ms. Cocca-Fulton engaged in a course of conduct to conceal evidence of their fraud, bad-faith, collusion and/or other malicious conduct aimed at disinheriting [wife]. See Prof.Cond.R. 8.4(c).

{¶48} Wife also submitted an affidavit of her daughter, Deena Calabrese, who stated, in part, that she was familiar with the A.F. King oil paintings owned by husband, and he owned two, not three, of those paintings. Further, husband sold those paintings in 2013, and he informed her that he did so to help pay for a trip that he and wife took to Naples, Florida. Wife's daughter indicated she is one of wife's three children, who were all close with husband. She further averred that, when she visited husband at Chardon Healthcare in October 2021, he "was in an objectively obvious state of dementia and both physical and mental decline. I specifically recall that he did not know what State he was in, he struggled to remember basic things about himself and he had a difficult time communicating in general."[3]

---

3. Deena Calabrese's affidavit contained further averments struck by the trial court. As the court's ruling relative to this affidavit is not challenged on appeal, we do not further discuss the contents of this affidavit.

Case No. 2025-L-018

{¶49} In addition, wife submitted affidavits of two of her attorneys, Adam Fried and Larry Zukerman. Her attorneys attached documents to their affidavits in support of opposition to summary judgment.

{¶50} Following wife's submission of her responses in opposition to summary judgment, appellees moved to strike several materials submitted by wife, including Mathews' report and the attachments to the affidavits of Adam Fried and Larry Zukerman.

{¶51} In its September 13, 2024 order, the trial court granted appellees' motion to strike Mathews' report, reasoning as follows:

> The Court finds that the report is inadmissible because it is speculative and renders a conclusion that is within the province of the finder of fact. "Expert opinion testimony is admissible as to an ultimate fact without infringing upon the function of the jury, if the determination of such ultimate fact requires the application of expert knowledge not within the common knowledge of the jury." (citations omitted) *McQueen v. Goldey*, 20 Ohio App.3d 41, 47 (12th Dist. 1984). The question of whether the Defendant Attorneys acted with malice is the ultimate question for the finder of fact and not of such a highly technical nature to be beyond the comprehension of the average juror.
>
> The Eleventh District Court of Appeals has previously held purported opinions about a defendant's motives or state of mind are not within the purview of permitted expert testimony; opinions on whether someone acted maliciously or in bad faith and (sic) are not premised on specialized knowledge beyond that of lay persons and are inadmissible legal conclusions. *See Parmertor v. Chardon Local Schools*, 2019-Ohio-328, ¶ 26 (11th Dist.). Furthermore, Mathews' conclusion that Attorney Cocca-Fulton "did not take appropriate steps to determine whether Casteel possessed the requisite testamentary capacity," when Mathews was not present during the interactions and has no specific experience in estate law, is completely speculative. Because a factfinder is capable of reaching conclusions on these issues without an expert-witness opinion, Mathews' testimony would be inadmissible at trial, and therefore cannot be relied upon in deciding the pending summary judgment motions. *Donlin v.*

*Rural Metro Ambulance, Inc.*, 2014-Ohio-1704, ¶ 26 (11th Dist.). For these reasons, the Court grants the Motion to Strike the Expert Report of Alvin Mathews.

{¶52} In her first assigned error, wife maintains that the trial court abused its discretion in striking Mathews' report. In large part, wife maintains that the trial court erred in this regard because it applied an incorrect definition of "malice."

{¶53} As set forth above, "[m]alice" means "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Omega Riggers & Erectors, Inc.*, 2016-Ohio-2961, at ¶ 31 (2d Dist.), quoting *Preston*, 32 Ohio St.3d 334, 336 (1987). Wife maintains that because unethical conduct is in the ambit of malice under the "conscious disregard" meaning of the term, and because expert testimony is required to determine if an attorney violated the Rules of Professional Conduct, the trial court erred in striking Mathews' affidavit.

{¶54} However, our review of Mathews' report, reproduced in large part above, indicates that he repeatedly speculated as to the intent of appellees, and he predicated many of his bases for liability on his opinions as to appellees' intent. "[A]n expert's opinion may not be based on 'mere possibility or speculation,' . . . ." *Shelly Materials, Inc. v. City of Streetsboro Planning & Zoning Comm.*, 2019-Ohio-4499, ¶ 19, quoting *State v. Beasley*, 2018-Ohio-493, ¶ 162.

{¶55} Based on the foregoing, we cannot say that the trial court abused its discretion in striking Mathews' report. Therefore, wife's first assigned error lacks merit.

{¶56} With respect to the affidavits of Fried and Zukerman, the trial court stated:

> [Appellees] also moved to strike the attached documents and Affidavits of Adam Fried and Larry Zuckerman (Exhibits C and

E, respectively to Plaintiff's Brief in Opposition to Judy and Cocca-Fulton's Motions for Summary Judgment). The Attorney Defendants argue that the documents have not been properly authenticated and further that many are hearsay or hearsay within hearsay. The Second District Court of Appeals set forth a thorough analysis of the authentication issue in *Stumpff v. Harris*, 2015-Ohio-1329 (2nd Dist.). The Court notes, however, that even in reviewing the documents attached to the Fried and Zuckerman Affidavits, they do not change the outcome of the Motions for Summary Judgment, so the Court declines to specifically decide this issue.

{¶57} On appeal, wife argues in her second assigned error that the trial court abused its discretion in failing to rule on the motions to strike the attachments to her attorneys' affidavits. In support, wife argues that the trial court was required to rule on the motion in order to fully view all evidence in the light most favorable to her as the nonmovant.

{¶58} However, the trial court stated that it did review the documents attached to the affidavits, but those materials did not affect its summary judgment determination. Wife has not demonstrated in her second assigned error any manner in which she was prejudiced by the trial court declining to specifically decide whether the documents were properly before it.

{¶59} Pursuant to Civ.R. 61, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." As wife has not demonstrated how she was prejudiced by the trial court's decision to not specifically rule on appellees' motions, she has not met her burden of demonstrating reversible error on appeal as to this issue.

{¶60} Accordingly, wife's second assigned error lacks merit.

{¶61} In her third assigned error, wife maintains that genuine issues of material fact exist which precluded summary judgment in favor of appellees.

{¶62} In support of wife's argument, she relies partially on Mathews' affidavit, which we determined the trial court did not abuse its decision in striking. Accordingly, we limit our review to the remaining summary judgment evidence that wife maintains supports a triable issue as to "malice" for purposes of third-party malpractice claims.

{¶63} Wife maintains that the summary judgment materials indicate a question of whether Judy represented Rainsberger in both her roles as an individual and as a fiduciary under the power of attorney and the trust. Accordingly, wife argues that there exist triable issues as to whether this representation constituted a conflict of interest, and whether Judy assisted Rainsberger in facilitating violations of her fiduciary duty to wife.

{¶64} Further, wife argues that the record indicates that Cocca-Fulton was aware that Rainsberger had engaged in self-dealing with respect to her role as husband's power of attorney, and despite this, Cocca-Fulton agreed to amend husband's trust to benefit Rainsberger. Also, because Cocca-Fulton sent her fee agreement to Rainsberger, wife maintains that a genuine issue remained as to whether Rainsberger was her client and whether Cocca-Fulton was engaging in a conflict of interest.

{¶65} Wife additionally maintains that Cocca-Fulton's assessment of husband's capacity was deficient, as she was aware of the physician's letter indicating that husband could not make financial decisions. Wife maintains that the evidence demonstrates that husband acknowledged ownership of paintings and accounts which he no longer owned at the time Cocca-Fulton met with him.

Case No. 2025-L-018

{¶66} Wife further relies on emails, some of which are discussed in our recitation of the deposition testimony above, between Rainsberger, Judy, and Cocca-Fulton as establishing a plan to wrongfully disinherit wife, and she suggests that Cocca-Fulton manufactured her memorandum as to husband's capacity to cover-up her wrongdoing.

{¶67} Having reviewed all of the summary judgment evidence on which wife relies in the light most favorable to her, we note that this evidence may be susceptible to a reasonable inference as to some generalized suspicious behavior. However, we do not agree that it could be reasonably inferred from the evidence that Judy and Cocca-Fulton had conflicts of interest in their representation of Rainsberger and husband, respectively, or that appellees acted with malice.

{¶68} Further, wife relies heavily on her position that questions of fact exist as to whether appellees engaged in other behavior violative of the Rules of Professional Conduct. We recognize there may be instances where such violations are committed with malice. However, in the context of third-party legal malpractice, we agree with the Second District that malice "cannot be predicated on actions by the attorney that the attorney is permitted to take, or even negligently may take, as part of the representation of plaintiffs' adversarial client. To constitute malice, the actions of the attorney must include a disregard of rights that the attorney, not the client, is required to protect and must include harm beyond that which legal action necessarily may inflict." *Omega Riggers & Erectors, Inc.*, 2016-Ohio-2961, ¶ 35 (2d Dist.). Reasonable inferences of such behavior cannot be gleaned from the record in this case.

{¶69} As wife failed to meet her reciprocal summary judgment burden on the issue of malice, an essential element of her claims against appellees, the trial court did not err

Case No. 2025-L-018

in granting summary judgment to appellees. Accordingly, wife's third assigned error lacks merit.

{¶70}   The judgment is affirmed.


ROBERT J. PATTON, P.J.,

MATT LYNCH, J.,

concur.

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs

_____
JUDGE MATT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-L-018